**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
<u>DALLAS DIVISION</u>**

| | |
|---|---|
| MONICA DEL BOSQUE, JENNA RODRIGUEZ, FABIOLA SOLIS-GARAY, NICOLE WARE, and PHILIP WATTERSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COCA-COLA SOUTHWEST BEVERAGES LLC,<br><br>Defendant. | **CIVIL ACTION NO.**: |

**<u>COMPLAINT</u>**

Plaintiffs Monica Del Bosque, Jenna Rodriguez, Fabiola Solis-Garay, Nicole Ware, and Philip Watterson ("Plaintiffs"), by and through their attorneys, on behalf of the Coca-Cola Southwest Beverages 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciary, Coca-Cola Southwest Beverages LLC ("Coca-Cola SW" or the "Company"), for breaches of its fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

2.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

3.     The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers." *See* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) ("*Tibble II*") (en banc) (quoting Restatement (Third) of Trusts, § 90, cmt. b).

6.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees…lose not only money

spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.    The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

8.    Like other companies that sponsor 401(k) plans for their employees, Coca-Cola SW enjoys both direct and indirect benefits by providing matching contributions to the Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview. However, Defendant has not followed ERISA's standard of care. This lawsuit is filed after careful review of publicly available documents to return benefits taken from Plan participants by Defendant.

9.    The Plan is a defined contribution retirement plan or a 401(k) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. As of December 31, 2023, the Plan had 11,150 total participants, and $543,218,631 in assets. *See* 2023 Form 5500 for the Plan.

10.   Plaintiffs allege that during the putative Class Period, Defendant, as a "fiduciary" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1)

failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) failing to "defray[] reasonable expenses of administering the [Plan]." 29 U.S.C. § 1104(a)(A)(ii)..

11.     Defendant's mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Its actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

12.     Based on this conduct, Plaintiffs assert claims against Defendant for breach of the fiduciary duty of prudence (Count I), breach of the fiduciary duty of loyalty (Count II), and breach of ERISA's Anti-Inurement Provision (Count III).

## II.    JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

14.     This Court has personal jurisdiction over Defendant because it is headquartered and transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

15.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendant resides and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

III.   **PARTIES**

**Plaintiffs**

16.     Plaintiff, Monica Del Bosque ("Del Bosque"), resides in Carollton, TX. During her employment, Plaintiff Del Bosque participated in the Plan. Ms. Del Bosque invested in the JPMorgan SmartRetirement® 2040 A fund in the Plan. Plaintiff Del Bosque also suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay Plan's administrative and recordkeeping ("RKA") services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Del Bosque's individual account to pay for the RKA costs.

17.     Plaintiff, Jenna Rodriguez ("Rodriguez"), resides in Houston, TX. During her employment, Plaintiff Rodriguez participated in the Plan. Ms. Rodriguez invested in the JPMorgan SmartRetirement® 2055 A fund in the Plan. Plaintiff Rodriguez also suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Rodriguez's individual account to pay for the RKA costs.

18.     Plaintiff, Fabiola Solis-Garay ("Solis-Garay"), resides in Fort Liberty, NC. During her employment, Plaintiff Solis-Garay participated in the Plan. Ms. Solis-Garay invested in the JPMorgan SmartRetirement® 2060 fund in the Plan. Plaintiff Solis-Garay also suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Solis-Garay's individual account to pay for the RKA costs.

19.     Plaintiff, Nicole Ware ("Ware"), resides in Jewett, TX. During her employment, Plaintiff Ware participated in the Plan. Plaintiff Ware suffered injury due to the fact that Defendant

failed to use forfeited Plan funds to pay Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Ware's individual account to pay for the RKA costs.

20.    Plaintiff, Philip Watterson ("Watterson"), resides in Spring, TX. During his employment, Plaintiff Watterson participated in the Plan. Mr. Watterson invested in the JPMorgan SmartRetirement® 2040 A fund in the Plan. Plaintiff Watterson also suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Watterson's individual account to pay for the RKA costs.

21.    Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendant's unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duties as described herein.

22.    Plaintiffs did not have knowledge of all material facts necessary to understand that Defendant breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**<u>Defendant</u>**

23.    Coca-Cola SW is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 5420 Lyndon B. Johnson Fwy, #800, Dallas, Texas. *See* The December 31, 2021 Form 5500 of the Plan filed with the United States Department of Labor ("2021 Form 5500") at 1. Coca-Cola SW, a company of Arca Continental, is one of the largest Coca-Cola bottlers in the United States. The Company makes, markets and distributed bottled

beverages in Texas, and parts of Oklahoma, New Mexico and Arkansas. Coca-Cola SW currently employs "more than 8,000 associates who operate 7 production plants and 37 sales and distribution facilities, serving more than 31 million consumers."[2]

24.    The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons. First, it is a named fiduciary under the Plan. *See* Adoption Agreement for the Transamerica Retirement Solutions, LLC Pre-Approved 401(k) Profit Sharing Plan at 2 ("Named Fiduciary Name: Coca-Cola Southwest Beverages LLC"); Second, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.[3]

## IV.    CLASS ACTION ALLEGATIONS[4]

25.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons, except Defendant and Defendant's immediate family members, who were participants in or beneficiaries of the Plan, at

---

[2] https://www.cocacolaswb.com/home/#:~:text=CCSWB%20produces%2C%20markets%20and%20distributes,more%20than%2031%20million%20consumers last accessed on October 22 2024.

[3] To the extent the Company or its Board designated its fiduciary responsibilities to other individuals or entities, or appointed other individuals or entities to take on fiduciary responsibilities under the Plan, the breaches of fiduciary duties alleged herein apply equally to those individuals or entities.

[4] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

any time between October 28, 2018 to the date of judgment (the "Class Period").[5]

26. The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 11,150 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500 at 2.

27. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendant's mismanagement of the Plan. Defendant treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

28. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendant is a fiduciary of the Plan;

    B.    Whether Defendant breached its fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

    C.    The proper form of equitable and injunctive relief; and

    D.    The proper measure of monetary relief.

29. Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the

---

[5] Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

30.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

31.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

32.    The purpose of the Plan is to provide Coca-Cola SW employees "an easy way to save for [their] retirement using pre-tax contributions" that are directly deducted from employees' paychecks. Summary Plan Description for the Coca-Cola Southwest Beverages 401(k) Plan ("SPD"), at 3; *see also* Transamerica Retirement Solutions, LLC Pre-Approved 401(k) Profit Sharing Plan at 1 ("The purpose of the Plan is to provide retirement income benefits to Employees of the Participating Employer and to provide such Employees with an opportunity to accumulate retirement savings on a tax-deferred basis.").

33.    The Plan is a "defined contribution"[6] or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

34.    The Plan was established effective as of April 1, 2017. *See* SPD at 3; *see also* 2023 Form 5500 at 1.

### Eligibility

35.    To participate in the Plan, a participant must have worked at the Company for at least thirty days. *See* SPD at 5; *see also* Independent Auditor's Report attached to 2023 Form 5500 at 7 ("All eligible employees may begin participating in the Plan upon attaining 30 days of service, with the entry date being the first day of the next payroll period following meeting the participation requirements.").

### Contributions

36.    Participants may elect to contribute up to 50% of their salary, "subject to the maximum amount permitted by law." SPD at 7; *see also* Independent Auditor's Report attached to 2023 Form 5500 at 7 ("The Plan allows participants to contribute up to 50% of eligible compensation on a pre-tax basis.").

37.    Further, "[p]articipants who have attained age 50 before the end of the plan year are eligible to make catch-up contributions." Independent Auditor's Report attached to 2023 Form 5500 at 7; *see also* SPD at 7 ("You may be allowed to make additional catch-up salary deferral

---

[6] SPD at 3 ("The Plan is known as a defined contribution 401(k) profit sharing plan.").

contributions beginning in the calendar year in which you become age 50 or in any calendar year.").

38.     Finally, "[p]articipants may also contribute amounts representing distributions from other qualified defined benefit or defined contribution plans (rollovers)." Independent Auditor's Report attached to 2023 Form 5500 at 7; *see also* SPD at 10 ("[Participants] may elect that a direct rollover be made into this Plan from the other plan.").

39.     Coca-Cola SW "make[s] safe harbor matching contribution each payroll period equal to 100% of [participant's] first 3% of [their] pre-tax salary deferral contributions, plus 50% of the next 6% of [their] salary deferral contributions up to a maximum of 9% of [their] salary." SPD at 9; *see also* Independent Auditor's Report attached to 2023 Form 5500 at 7 ("Each pay period, the Company contributes a safe harbor matching contribution equal to 100% of the first 3% of eligible compensation that the employee contributes to the Plan, plus 50% of the participant's salary deferrals that exceed 3% of eligible compensation up to a maximum of 9% of eligible compensation.").

40.     The Company, may also "choose to make an annual nonelective contribution." SPD at 9; *see also* Independent Auditor's Report attached to 2023 Form 5500 at 8 ("The Plan also provides for discretionary employer matching contributions and discretionary employer non-elective contributions.").

41.     Like other companies that sponsor 401(k) plans for their employees, Coca-Cola SW enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

42.    Coca-Cola SW also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

43.    Given the size of the Plan, Coca-Cola SW likely enjoyed significant tax and cost savings from offering a match.

*Vesting*

44.    Participants are 100% fully vested in their voluntary contributions. *See* SPD at 14; *see also* Adoption Agreement for the Transamerica Retirement Solutions, LLC Pre-Approved 401(k) Profit Sharing Plan ("Plan Doc.") at 48 ("Participants are always 100% fully vested in their Employee Contributions (including Elective Deferrals, Catch-Up Contributions, Roth Elective Deferrals, Voluntary After-Tax Contributions and Required After-Tax Contributions)").

45.    "Safe harbor matching contributions, nonelective contributions and minimum contributions, if any, become [100%] 'vested'" after two years of completed service. SPD at 15; *see also* Plan Doc. at 48.

46.    In addition, employees become 100% vested in safe harbor matching contributions, nonelective contributions and minimum contributions, after they reach the age of 65, become permanently disabled, or die. *See* SPD at 16.

*Forfeited Accounts*

47.    "The portion of [participants'] account that is not yet vested will be considered a 'forfeiture.'" SPD at 17.

48.    Forfeitures of nonelective contributions can be used to: (1) restore participant accounts; (2) offset Plan expenses; or (3) reduce any nonelective contributions. *Id*.

49.     Forfeitures of matching contributions can be used to: (1) restore participants accounts; or (2) reduce any matching contributions. *Id*.

50.     "Effective August 1, 2023, the Plan was amended to allow the use of forfeitures from nonelective contributions to reduce future matching contributions." Independent Auditor's Report attached to 2022 Form 5500 at 17.

### The Plan's Investments

51.     Several funds were available to Plan participants for investment each year during the Class Period, including several JPMorgan SmartRetirement® target date funds ("JPMorgan TDFs").[7] For 2018, the Plan offered 22 investment options, including 14 mutual funds worth $240,943,644. *See* Independent Auditor's Report attached to 2018 Form 5500 at 14.

52.     The Plan's assets under management for all funds at the end of 2018 totaled $411,345,008. *See* 2018 Form 5500, Schedule H at 2.

53.     By the end of 2023, the Plan's assets under management totaled $543,218,631. *See* 2023 Form 5500, Schedule H at 2.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT THE PLAN'S FIDUCIARIES FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    Overview - ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

54.     As described in the "Parties" section above, Defendant was a fiduciary of the Plan.

55.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct.

---

[7] After November 17, 2021, the assets in the JPMorgan TDFs were transferred to BlackRock LifePath Index series target date funds. See Independent Auditor's Report attached to 2021 Form 5500 at 17.

2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S.Ct. at 741.

56.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendant's decision-making process with respect to the Plan, including Defendant's processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendant prior to discovery.

57.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Plan administrator to request, among other things, "all written instruments" governing or pertaining to the Plan, including "investment policy statements and investment management contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," as well as any committee's meeting minutes. This request was made on September 27, 2022.

58.    By letter dated October 22, 2022, Coca-Cola SW responded to Plaintiffs' request. No investment policy statement, to the extent it exists, or meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request.

59.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to

investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

60. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

61. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

62. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

63. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. See the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

64. A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

65.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

66.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

67.     The specific methodologies used to select prudent investments are primarily data driven. Such data is provided by investment research companies like Morningstar, which is the most accepted source of investment performance information, as it has the most robust information on mutual funds, collective investment trusts, and other types of investments. Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries.

68.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

69.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

70.     Lastly, to the extent plan fiduciaries have adopted an investment policy statement, which does not appear to be the case here, those fiduciaries "must comply with the plan's written

statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

71.      Defendant's breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the JPMorgan TDFs in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.      Defendant Breached Its Fiduciary Duties by Selecting and Retaining in the Plan's Lineup the Chronically Underperforming JPMorgan TDFs**

**1.      The Use of Target Date Funds in 401(k) Plans**

72.      At all relevant times, Defendant maintained the authority to exercise control over the Plan's investments, including the Plan's JPMorgan TDFs.

73.      Defendant included in the Plan's menu of investment offerings the materially underperforming JPMorgan target date suite.

74.      The performance histories of these funds were mediocre and their risk return profiles were flat when compared to their appropriate peer groups.

75.      Target date funds are designed to provide a single diversified investment vehicle for plan participants.

76.      The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

77.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years or more.

78.     Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

79.     An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near.

80.     As mentioned above, the target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

81.     Target date funds have been divided into two broad categories by some industry professionals based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

82.     However, for purposes of this Complaint, it matters little whether a target date fund is a through or a to fund since the earliest retirement target year will be excluded from this analysis, currently the 2025 year. Doing this allows all target date funds to be compared equally since only the performance and risk return characteristics in the early to middle of the target date path are

considered for analysis. In fact, Morningstar, the most respected independent research database in the financial industry doesn't distinguish between a so called to or through fund as is indicated by the lack of a separate Morningstar category and index for to and through target date funds. Instead, all target date funds are expected to track the appropriate Morningstar indexes and benchmarks.

83.    A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants often invest all their retirement assets in a single target date fund that matches their retirement date.

84.    A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. This process includes a requirement for the fiduciary to regularly evaluate, among other things, the fund's performance history, fees, and any other relevant factors.

85.    With respect to investment returns, diligent investment professionals monitor the performance of their selected target date funds using appropriate "benchmarks."

86.    The measurement of target date funds against their peers is critical given that the peer funds represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

### 2.    The JPMorgan TDFs Chronically Underperformed

87.    In 2018, the Plan held over $204 million in the JPMorgan TDFs. *See* Auditor's Report attached to 2018 Form 5500 at 14. By the end of 2020, the Plan held over $234 million in the JPMorgan TDFs. *See* Auditor's Report attached to 2020 Form 5500 at 13. With such a large amount invested in the target date series, the Plan would have been able to choose virtually any available target date series for the Plan.

88.    The JPMorgan TDFs were the only target date investing options in the Plan up to November 17, 2021.[9] In other words, up to November 17, 2021, participants in the Plan who wanted to invest in a target date strategy had no choice other than the JPMorgan TDFs.

89.    Defendant was under an obligation under ERISA to carefully vet the JPMorgan TDFs before selecting them for inclusion in the Plan. Defendant was also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the JPMorgan TDFs on an ongoing basis thereafter.

### a.    The JPMorgan TDFs Materially Underperformed Relative to Comparator Target Date Funds and Indexes

90.    The JPMorgan TDFs consistently materially underperformed industry-accepted benchmarks for target date funds used by investment professionals as well as the benchmarks in the Series' disclosures.

91.    The JPMorgan TDFs can be compared to various similar target date funds ("Comparator Funds") and relevant indexes as benchmarks. The suitable Comparator Funds include the American Funds target date suite, MFS Lifetime target date suite, MoA Clear Passage target date suite and T. Rowe Price Retirement target date suite. These four target date suites are suitable Comparator Funds to the JPMorgan TDFs because Morningstar, the most well respected and accepted financial industry fund database places all five funds in the US Fund Target-Date Category and/or the US SA Target Date Category ("Target Date Category") and compares those funds to how an average fund in that category should perform by using the Morningstar Lifetime Moderate Index.

---

[9] JPMorgan TDFs ended as an investment option on November 17, 2021. *See* Schedule C, Line 2(h) Formula Descriptions attached to 2021 Form 5500. The assets in the JPMorgan TDFs were transferred to BlackRock LifePath Index series target date funds.

92.     A Morningstar Category is assigned by placing funds [*e.g.*, the American Funds target date suite, MFS Lifetime target date suite, MoA Clear Passage target date suite and T. Rowe Price Retirement target date suite, etc.] into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . . Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate Index category. *Id*.

93.     Further, Morningstar itself states that it created its categories "to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier")[10] at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be seeking 'growth,' but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id*.

94.     Morningstar is the most well-respected independent research tool available to the financial industry and is used and trusted by virtually all financial professionals and fiduciaries.

95.     Morningstar places the four Comparator Funds and the JPMorgan TDFs in the Target Date Category because the underlying holdings of each fund match the risk return profile

---

[10] Available at the following web address:
https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf. Last accessed on May 12, 2023.

of this category. The Target Date Category should concentrate its holdings in the large blend/risk return category. It's for this reason that the four Comparator Funds are accurate and suitable comparators along with the more than 200 funds that Morningstar has placed in the Target Date Category.[11]

96.    A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks, to evaluate the performance of the JPMorgan TDFs as early as the inception of the Class Period, or sooner, and on an ongoing basis, thereafter.

97.    The performance of the JPMorgan TDFs lagged behind the performance of the applicable Comparator Funds for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan.

98.    The yearly performance as early as 2014, well before the inception of the Class Period, shows that the JPMorgan TDFs were, historically, an imprudent selection. It is clear that out of more than 200 Morningstar peer funds in the LT Mod target date group, the JPMorgan TDFs were poor, at best. Here, the Comparator Funds from this Morningstar peer group will be analyzed, as against the sample year for the JPMorgan TDFs.

99.    As can be seen in the chart below, which compares the JPMorgan TDFs' performance relative to the Comparator Funds and the appropriate Morningstar Index, the Morningstar Lifetime Moderate Index, MSAAM40M, ("Morningstar Index"), it's clear the JPMorgan TDFs performed poorly as compared to its peers and the Morningstar Index. The

---

[11] Each year, as funds are created or discontinued, the number of funds in this category varied but generally averaged slightly more than 200 funds for both the US Fund Target-Date Category and the US SA Target Date Category. The list of funds in this Morningstar category in any given year, would include various share classes of each target date suite. In addition, the 200 funds referenced is conservative as the US Fund Target-Date Category and the US SA Target Date Category each averaged approximately 200 funds each year in their respective categories and both are meant to track the same index, namely the Lifetime Moderate Index.

Comparator Funds performed well above the Morningstar Index for the majority of the years before the Class Period while the JPMorgan TDFs performed below it the majority of the time. In the years leading up to the Class Period, the JPMorgan TDFs performed well below the Morningstar Index for several consecutive years and clearly should have been removed at that time or never have been included in the Plan. Even when the Comparator Funds performed below their Morningstar Index they were still outperforming the JPMorgan TDFs.

100.    This obligation to select appropriate funds for the Plan and/or to monitor the funds selected, which is a clear obligation of the Plan fiduciaries under ERISA, is continuing and continued to be an appropriate reason for removal of the JPMorgan TDFs up to the start of the Class Period. The chart below uses a historical 3-and 5-year average, as is required by industry professionals and trust law on which ERISA is based. *Hughes*, 142 S.Ct. at 741. This three-year and five-year average is based on total return meaning that the fees paid for the fund's maintenance and management are not factored into their performance. However, when taking into account total returns below, the Comparator Funds were the most cost-effective.

| Investment and Benchmark | 3 Year Return 1/1/2016 - 12/31/2018 | JPMorgan TDF % of Under-performance To Comparators | 5 Year Return 1/1/2014 - 12/31/2018 | JPMorgan TDF % of Under-performance To Comparators |
|---|---|---|---|---|
| **JPMorgan SmartRetirement® 2030 A** | **5.00** | | **4.14** | |
| American Funds 2030 Trgt Date Retire R6 | 6.92 | 38.40% | 5.63 | 36.03% |
| MFS Lifetime 2030 I | 6.29 | 25.80% | 4.47 | 8.10% |
| MoA Clear Passage 2030 Fund | 6.29 | 25.80% | 4.90 | 18.54% |
| T. Rowe Price Retirement 2030 | 6.43 | 2.23% | 5.03 | 21.65% |
| Benchmark: Morningstar Lifetime Mod 2030 TR USD | 6.26 | 25.20% | 4.44 | 7.35% |
| | | | | |
| **JPMorgan SmartRetirement® 2035 A** | **5.08** | | **4.17** | |
| American Funds 2035 Trgt Date Retire R6 | 7.43 | 46.26% | 5.95 | 42.72% |
| MFS Lifetime 2035 I | 6.52 | 28.35% | 4.65 | 11.58% |
| MoA Clear Passage 2035 Fund | 6.53 | 28.54% | 4.98 | 19.53% |
| T. Rowe Price Retirement 2035 | 6.61 | 30.12% | 5.18 | 24.19% |

| | | | | |
|---|---|---|---|---|
| Benchmark: Morningstar Lifetime Mod 2035 TR USD | 6.72 | 32.28% | 4.61 | 10.69% |
| | | | | |
| **JPMorgan SmartRetirement® 2040 A** | **5.34** | | **4.30** | |
| American Funds 2040 Trgt Date Retire R6 | 7.62 | 42.70% | 6.05 | 40.64% |
| MFS Lifetime 2040 I | 6.70 | 25.47% | 4.80 | 11.69% |
| MoA Clear Passage 2040 Fund | 6.46 | 20.97% | 4.75 | 10.41% |
| T. Rowe Price Retirement 2040 | 6.77 | 26.78% | 5.30 | 23.30% |
| Benchmark: Morningstar Lifetime Mod 2040 TR USD | 6.98 | 30.71% | 4.65 | 8.24% |
| | | | | |
| **JPMorgan SmartRetirement® 2045 A** | **5.29** | | **4.28** | |
| American Funds 2045 Trgt Date Retire R6 | 7.77 | 46.88% | 6.17 | 44.25% |
| MFS Lifetime 2045 I | 6.83 | 29.11% | 4.88 | 14.06% |
| MoA Clear Passage 2045 Fund | 6.40 | 20.98% | 4.63 | 8.36% |
| T. Rowe Price Retirement 2045 | 6.81 | 28.73% | 5.31 | 24.28% |
| Benchmark: Morningstar Lifetime Mod 2045 TR USD | 7.05 | 33.27% | 4.60 | 7.56% |
| | | | | |
| **JPMorgan SmartRetirement® 2050 A** | **5.27** | | **4.26** | |
| American Funds 2050 Trgt Date Retire R6 | 7.83 | 48.51% | 6.19 | 45.21% |
| MFS Lifetime 2050 I | 6.80 | 29.00% | 4.86 | 14.03% |
| MoA Clear Passage 2050 Fund | 6.33 | 20.04% | 4.93 | 15.54% |
| T. Rowe Price Retirement 2050 | 6.80 | 29.00% | 5.32 | 24.83% |
| Benchmark: Morningstar Lifetime Mod 2050 TR USD | 7.05 | 33.72% | 4.51 | 5.79% |
| | | | | |
| **JPMorgan SmartRetirement® 2055 A** | **5.29** | | **4.29** | |
| American Funds 2055 Trgt Date Retire R6 | 7.81 | 47.70% | 6.17 | 43.85% |
| MFS Lifetime 2055 I | 6.62 | 25.28% | 4.76 | 10.81% |
| MoA Clear Passage 2055 Fund | | | | |
| T. Rowe Price Retirement 2055 | 6.78 | 28.21% | 5.31 | 23.60% |
| Benchmark: Morningstar Lifetime Mod 2055 TR USD | 7.04 | 33.21% | 4.42 | 3.07% |
| | | | | |
| **JPMorgan SmartRetirement® 2060 A** | **N/A** | | **N/A** | |
| American Funds 2060 Trgt Date Retire R6 | N/A | | N/A | |
| MFS Lifetime 2060 I | N/A | | N/A | |
| MoA Clear Passage 2060 Fund | 6.75 | | N/A | |
| T. Rowe Price Retirement 2060 | 7.02 | | N/A | |

| | | | | |
|---|---|---|---|---|
| Benchmark: Morningstar Lifetime Mod 2060 TR USD | 7.02 | | 4.34 | |

101.    By 2018, the start of the Class Period, the JPMorgan TDFs underperformed the Comparator Funds on average by 30.21% on a three-year basis and 23.26% on a five-year basis. In fact, the JPMorgan TDFs underperformed every Comparator Fund for each target date series on a three-year and five-year basis.

102.    Further, by the start of the Class Period in 2018, the JPMorgan TDFs underperformed the Morningstar benchmark on average by 31.40% on a three-year basis and 7.12% on a five-year basis. The chart above demonstrates that the JPMorgan TDFs should never have been selected as an investment option for Plan participants at the inception of the Plan in 2017, or at the start of the Class Period in 2018.

103.    This trend of underperformance continued to the end of 2020, which was or should have been apparent to the Plan fiduciaries at the beginning of the Class Period, as the JPMorgan TDFs significantly underperformed the Comparator Funds and its Morningstar Index. Yet, the Plan fiduciaries again neglected to take action while millions of dollars of retirement savings of the Plan's participants evaporated. These underperformance issues are demonstrated in the chart below.

| Investment and Benchmark | 3 Year Return 1/1/2018 - 12/31/2020 | JPMorgan TDF % of Under-performance To Comparators | 5 Year Return 1/1/2016- 12/31/2020 | JPMorgan TDF % of Under-performance To Comparators |
|---|---|---|---|---|
| **JPMorgan SmartRetirement® 2030 A** | **7.58** | | **9.36** | |
| American Funds 2030 Trgt Date Retire R6 | 9.84 | 29.70% | 11.06 | 18.16% |
| MFS Lifetime 2030 I | 8.76 | 15.57% | 10.37 | 10.81% |
| MoA Clear Passage 2030 Fund | 8.39 | 10.57% | 10.33 | 10.39% |
| T. Rowe Price Retirement 2030 | 9.98 | 31.66% | 11.34 | 21.17% |
| Benchmark: Morningstar Lifetime Mod 2030 TR USD | 9.09 | 19.83% | 10.58 | 13.05% |
| | | | | |
| **JPMorgan SmartRetirement® 2035 A** | **8.20** | | **10.07** | |

| | | | | |
|---|---|---|---|---|
| American Funds 2035 Trgt Date Retire R6 | 11.19 | 36.46% | 12.44 | 23.51% |
| MFS Lifetime 2035 I | 9.49 | 15.71% | 11.28 | 12.04% |
| MoA Clear Passage 2035 Fund | 8.85 | 7.85% | 10.97 | 8.95% |
| T. Rowe Price Retirement 2035 | 10.48 | 27.73% | 11.90 | 18.16% |
| Benchmark: Morningstar Lifetime Mod 2035 TR USD | 9.14 | 11.40% | 11.14 | 10.63% |
| | | | | |
| **JPMorgan SmartRetirement® 2040 A** | **8.61** | | **10.66** | |
| American Funds 2040 Trgt Date Retire R6 | 11.76 | 36.61% | 12.99 | 21.93% |
| MFS Lifetime 2040 I | 9.66 | 12.20% | 11.61 | 8.99% |
| MoA Clear Passage 2040 Fund | 9.07 | 5.33% | 11.20 | 5.11% |
| T. Rowe Price Retirement 2040 | 10.93 | 26.92% | 12.38 | 16.20% |
| Benchmark: Morningstar Lifetime Mod 2040 TR USD | 9.10 | 5.75% | 11.48 | 7.75% |
| | | | | |
| **JPMorgan SmartRetirement® 2045 A** | **8.86** | | **10.85** | |
| American Funds 2045 Trgt Date Retire R6 | 11.96 | 34.92% | 13.22 | 21.86% |
| MFS Lifetime 2045 I | 9.77 | 10.18% | 11.86 | 9.36% |
| MoA Clear Passage 2045 Fund | 8.97 | 1.26% | 11.19 | 3.15% |
| T. Rowe Price Retirement 2045 | 11.20 | 26.41% | 12.63 | 16.46% |
| Benchmark: Morningstar Lifetime Mod 2045 TR USD | 9.03 | 1.94% | 11.61 | 7.01% |
| | | | | |
| **JPMorgan SmartRetirement® 2050 A** | **8.84** | | **10.83** | |
| American Funds 2050 Trgt Date Retire R6 | 12.12 | 37.08% | 13.36 | 23.38% |
| MFS Lifetime 2050 I | 9.74 | 10.10% | 11.83 | 9.20% |
| MoA Clear Passage 2050 Fund | 8.86 | 0.15% | 11.18 | 3.26% |
| T. Rowe Price Retirement 2050 | 11.19 | 26.52% | 12.62 | 16.55% |
| Benchmark: Morningstar Lifetime Mod 2050 TR USD | 8.96 | 1.31% | 11.62 | 7.28% |
| | | | | |
| **JPMorgan SmartRetirement® 2055 A** | **8.88** | | **10.85** | |
| American Funds 2055 Trgt Date Retire R6 | 12.11 | 36.32% | 13.35 | 23.09% |
| MFS Lifetime 2055 I | 9.76 | 9.90% | 11.72 | 8.04% |
| MoA Clear Passage 2055 Fund | 8.90 | 0.20% | | |
| T. Rowe Price Retirement 2055 | 11.15 | 25.50% | 12.59 | 16.09% |
| Benchmark: Morningstar Lifetime Mod 2055 TR USD | 8.88 | 0.00% | 11.61 | 7.01% |
| | | | | |
| **JPMorgan SmartRetirement® 2060 A** | **8.89** | | **N/A** | |
| American Funds 2060 Trgt Date Retire R6 | 12.11 | 36.26% | 13.35 | |
| MFS Lifetime 2060 I | 9.87 | 11.04% | N/A | |
| MoA Clear Passage 2060 Fund | N/A | | N/A | |
| T. Rowe Price Retirement 2060 | 11.14 | 25.36% | 12.56 | |
| Benchmark: Morningstar Lifetime Mod 2060 TR USD | 8.81 | -0.91% | 11.57 | |

104.    By the end of 2020, the JPMorgan TDFs underperformed the Comparator Funds on average by 20.28% on a three-year basis and 13.87% on a five-year basis.

105.    Further, by the end of 2020, the JPMorgan TDFs underperformed the Morningstar benchmark on average by 5.62% on a three-year basis and 8.79% on a five-year basis.

106.    To make matters worse, the JPMorgan TDFs ranked poorly as compared to its peers in its Morningstar Category.

| Investment | Percentile Rank 3-Year Return Ending 2018 | Percentile Rank 3-Year Return Ending 2020 | Percentile Rank 5-year Return Ending 2018 | Percentile Rank 5-year Return Ending 2020 |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2030 A | 78th | 85th | 66th | 81st |
| JPMorgan SmartRetirement 2035 A | 84th | 88th | 69th | 80th |
| JPMorgan SmartRetirement 2040 A | 81st | 70th | 69th | 74th |
| JPMorgan SmartRetirement 2045 A | 86th | 80th | 70th | 79th |
| JPMorgan SmartRetirement 2050 A | 88th | 79th | 71st | 83rd |
| JPMorgan SmartRetirement 2055A | 88th | 80th | 69th | 86th |
| JPMorgan SmartRetirement 2060 A | N/A | 83rd | N/A | N/A |

107.    There's no justifiable excuse for having allowed the JPMorgan TDFs to be selected as investment options for Plan participants or to languish in the Plan until the end of 2021 without taking any action at all. This issue has nothing to do with any differences in the purpose of the Series or any possible justifiable difference in investment strategy, it's simply evidence of a clearly flawed investment strategy.

108.    By choosing or continuing to include the JPMorgan TDFs in the Plan despite the clear evidence that the funds had a flawed investment strategy as evidenced by the Series' performance for many years prior to the Class Period and during the Class period, it deprived Plan participants of meaningful returns costing them millions of dollars in retirement savings needlessly. The JPMorgan TDFs should never have been selected for the Plan and certainly should

not have been permitted to languish in the Plan for years with no action taken by the Plan fiduciaries until the end of 2021, which was simply too little too late.

> **b.    The Fees Associated with the JPMorgan TDFs Were Unreasonable Compared to Fees of the Prudent Investment Alternatives**

109.    As noted above, under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

110.    Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

111.    On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds.

112.    Further, "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble II*, 843 F.3d at 1197-98.

113.    As represented above, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher

fees…lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

114.    Each of the Target Date year funds had an expense ratio at or in excess of .75%. Compared to the Comparator Funds, this cost was higher than the Comparator Funds, while the JPMorgan TDFs performed worse than the Comparator Funds. The chart below utilizes 2024 expense ratio figures from Morningstar as an exemplar year to demonstrate the discrepancy in expenses.  The degree of the discrepancy in fees between the JPMorgan TDFs and Comparator Funds were similar from 2018 through 2021.  Thus, investment in the JPMorgan TDFs cost Plan participants monetary losses that will impact them over their lifetime:

| Fund in Plan | 2024 Exp. Ratio | Peer Group Funds | 2024 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2020 A | 0.75% | American Funds 2020 Trgt Date Retire R6 | 0.31% | Target date | 142% |
| | | MFS Lifetime 2020 I | 0.47% | | 60% |
| | | MoA Clear Passage 2020 Fund | 0.45% | | 67% |
| | | T. Rowe Price Retirement 2020 | 0.53% | | 42% |
| JPMorgan SmartRetirement 2025 A | 0.78% | American Funds 2025 Trgt Date Retire R6 | 0.32% | Target date | 144% |
| | | MFS Lifetime 2025 I | 0.47% | | 66% |
| | | MoA Clear Passage 2025 Fund | 0.41% | | 90% |
| | | T. Rowe Price Retirement 2025 | 0.54% | | 44% |
| JPMorgan SmartRetirement 2030 A | 0.79% | American Funds 2030 Trgt Date Retire R6 | 0.33% | Target date | 139% |
| | | MFS Lifetime 2030 I | 0.51% | | 55% |
| | | MoA Clear Passage 2030 Fund | 0.39% | | 103% |
| | | T. Rowe Price Retirement 2030 | 0.57% | | 39% |
| JPMorgan SmartRetirement 2035 A | 0.83% | American Funds 2035 Trgt Date Retire R6 | 0.35% | Target date | 126% |
| | | MFS Lifetime 2035 I | 0.55% | | 51% |
| | | MoA Clear Passage 2035 Fund | 0.36% | | 131% |
| | | T. Rowe Price Retirement 2035 | 0.59% | | 41% |
| JPMorgan SmartRetirement 2040 A | 0.84% | American Funds 2040 Trgt Date Retire R6 | 0.37% | Target date | 127% |
| | | MFS Lifetime 2040 I | 0.57% | | 47% |
| | | MoA Clear Passage 2040 Fund | 0.34% | | 147% |
| | | T. Rowe Price Retirement 2040 | 0.60% | | 40% |
| JPMorgan SmartRetirement 2045 A | 0.85% | American Funds 2045 Trgt Date Retire R6 | 0.37% | Target date | 130% |
| | | MFS Lifetime 2045 I | 0.58% | | 47% |
| | | MoA Clear Passage 2045 Fund | 0.33% | | 158% |

| | | T. Rowe Price Retirement 2045 | 0.62% | | 37% |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2050 A | 0.85% | American Funds 2050 Trgt Date Retire R6 | 0.38% | Target date | 124% |
| | | MFS Lifetime 2050 I | 0.58% | | 47% |
| | | MoA Clear Passage 2050 Fund | 0.34% | | 150% |
| | | T. Rowe Price Retirement 2050 | 0.63% | | 35% |
| JPMorgan SmartRetirement 2055A | 0.85% | American Funds 2055 Trgt Date Retire R6 | 0.38% | Target date | 124% |
| | | MFS Lifetime 2055 I | 0.58% | | 47% |
| | | MoA Clear Passage 2055 Fund | 0.37% | | 130% |
| | | T. Rowe Price Retirement 2055 | 0.64% | | 33% |
| JPMorgan SmartRetirement 2060 A | 0.84% | American Funds 2060 Trgt Date Retire R6 | 0.39% | Target date | 115% |
| | | MFS Lifetime 2060 I | 0.57% | | 47% |
| | | MoA Clear Passage 2060 Fund | 0.40% | | 110% |
| | | T. Rowe Price Retirement 2060 | 0.64% | | 31% |

115. On average, the expense ratios for JPMorgan TDFs in the Plan were up to 85% above the expense ratios for the Comparator Funds and 39% above the Morningstar median expense ratios of all funds in the same category:

| Investment | Expense Ratio | Peer Group Median Expense Ratio | % Fee Excess |
|---|---|---|---|
| JPMorgan SmartRetirement 2030 A | 0.79% | 0.60% | 32% |
| JPMorgan SmartRetirement 2035 A | 0.83% | 0.60% | 38% |
| JPMorgan SmartRetirement 2040 A | 0.84% | 0.64% | 31% |
| JPMorgan SmartRetirement 2045 A | 0.85% | 0.63% | 35% |
| JPMorgan SmartRetirement 2050 A | 0.85% | 0.64% | 33% |
| JPMorgan SmartRetirement 2055A | 0.85% | 0.65% | 31% |
| JPMorgan SmartRetirement 2060 A | 0.84% | 0.64% | 31% |

116. Had the Plan fiduciaries conducted an impartial review of the Plan's investments they would have easily noticed the JPMorgan TDFs were far more expensive than Comparator funds and the Morningstar benchmarks.

**C.    Defendant Breached Its Fiduciary Duties by Improperly Reducing the Company's Plan Contributions Through Forfeiture Accounts**

117. During the Class Period, Defendant breached its ERISA fiduciary duties by misusing the Plan's assets for Defendant's own benefit and to the detriment of Plan participants.

118. As explained above, any Company contributions that do not vest are forfeited.

119.    Defendant improperly used forfeited, non-vested Plan assets since at least the beginning of the Class Period for the Company's own benefit to reduce future Company contributions instead of using the funds to benefit Plan participants.

120.    According to information from the Plan's Form 5500, the following represents the balance in the Plan's forfeiture accounts during the Class Period, the amount of the forfeiture improperly used to offset Coca-Cola SW's contributions to the Plan, and the amounts used to pay for Plan administration costs:

| Year | Forfeiture Balance | Amts. Used to Offset Employer Contributions | Amts Used to Pay Admin Costs |
|---|---|---|---|
| **2018** | $985,000 | Unknown | Unknown |
| **2019** | $1,300,000 | $1,500,000[12] | $0 |
| **2020** | $1,618,235 | $996,000[13] | $631 |
| **2021** | $1,315,514 | $1,783,903 | Unknown[14] |
| **2022** | $1,285,111 | $378,993 | Unknown[15] |
| **2023** | $662,238 | $2,461,127[16] | $73,501 |
| **Total** | | **$8,103,416** | **$74,132** |

---

[12] *See* Independent Auditor's Report attached to 2019 Form 5500 at 6 ("During 2019, Company non-elective contributions were reduced by $1.5 million from using forfeited non-vested accounts.").

[13] *See* Independent Auditor's Report attached to 2020 Form 5500 at 7 ("forfeitures of approximately $996,000 were used to reduce employer contributions and $631 was used to pay Plan expenses.").

[14] *See* Independent Auditor's Report attached to 2021 Form 5500 at 7 ("forfeitures of $1,783,903 were used to reduce employer contributions and pay Plan expenses.").

[15] *See* Independent Auditor's Report attached to 2022 Form 5500 at 11 ("During the year ended December 31, 2022, $1,362,386 of forfeited amounts were used to reduce Plan expenses and Company contributions.").

[16] *See* Independent Auditor's Report attached to 2023 Form 5500 at 8 ("Forfeitures of $2,461,127 were used to reduce employer matching contributions and forfeitures of $73,501 were used to pay plan administrative expenses.").

121.    Based on the above chart, from the beginning of the Class Period through 2022, up to $8.1 million was improperly steered from paying RKA costs and instead used to benefit the Company.

122.    Defendant effectively placed its own interests above the interests of the Plan and its participants and caused harm to the Plan and its participants by reducing Plan assets, not allocating forfeited funds to Plan participants' accounts, and also caused Plan participants to incur as much as $8.1 million in expenses that could otherwise have been covered in whole or in part by forfeited funds.

123.    Additionally, based on the fact that in 2019, 2021 and 2023 the amount of offset exceeded the balance of the forfeiture accounts, it is likely the Company used forfeiture funds from prior years to offset Company contributions. This is a violation of IRS and general ERISA requirement that forfeitures are to be exhausted during the year in which they are incurred.

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**

124.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

125.    At all relevant times, the Company ("Prudence Defendant") was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

126.    As fiduciaries of the Plan, the Defendant was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

127.    The Prudence Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendant did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Prudence Defendant selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

128.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

129.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

130.    The Prudence Defendant knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Breach of Fiduciary Duty of Loyalty**

131.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

132.    At all relevant times, the Company ("Loyalty Defendant") was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

133.    As fiduciaries of the Plan, the Company was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

134.    Pursuant to 29 U.S.C. § 1104(a)(1)(A), the Loyalty Defendant was required to discharge its duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

135.    The Loyalty Defendant failed to exercise their duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of the Company instead of the sole interest of the Plan participants and beneficiaries.

136.    The Loyalty Defendant used these Plan assets for the purpose of reducing the Company's own contributions to the Plan, thereby saving the Company millions of dollars each year at the expense of the Plan which received decreased Company contributions and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

137.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses.

138.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any

profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

**COUNT III**
**Breach of ERISA's Anti-Inurement Provision**

139.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

140.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

141.    Because all forfeited Plan participant funds are initially placed in the Plan's trust, these forfeited funds are Plan assets.

142.    The Company's use of the forfeited funds to defray its own contributions to the Plan in order to save itself millions of dollars in funds that the Company would otherwise have to contribute to the Plan, caused the assets of the Plan to inure to the benefit of the Company in violation of 29 U.S.C. § 1103(c)(1).

143.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendant is liable to restore to the Plan all losses caused by its breaches of ERISA's anti-inurement provision, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

**PRAYER FOR RELIEF**

136.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendant on all claims and requests that the Court awards the following relief:

35

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendant has breached its fiduciary duties under ERISA;

D.      An Order compelling the Defendant to make good to the Plan all losses to the Plan resulting from Defendant's breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendant\ made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendant had fulfilled its fiduciary obligations;

E.      An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendant from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.       An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund

doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: October 28, 2024                    Respectfully submitted,


**WARD + WHITE PLLC**
*Daniel L. White*
Daniel L. White, Esquire
TX Attorney ID #24090588
114 ½ E. Louisianna Street
Suite 206
McKinney, TX  75069
Email: dwhite@wardwhitepllc.com
Tel.: (469) 541-0040

**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh, Esquire
PA Attorney ID #88587
James A. Maro, Esquire
PA Attorney ID #86420
(*Admissions Pro Hac Vice to be Requested*)
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
        jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*